# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADAM AND SYLVIA SPECTOR,<br>    Plaintiffs,<br><br>    v.<br><br>FIREMAN'S FUND INSURANCE CO.<br>T/A/D/B/A<br>NATIONAL SURETY CORPORATION,<br>    Defendant. | CIVIL ACTION<br><br>NO. 09-1311 |

## MEMORANDUM

**Tucker, J.**                                                                                                                    **July ___, 2010**

After a bench trial in this matter on June 16, 2010, and pursuant to Fed. R. Civ. P. 52(a), the Court makes the following Findings of Fact:

1. Plaintiffs Adam and Sylvia Spector ("Plaintiffs") purchased their home in 2000 for approximately $1,300,000.00. The home is over 8,000 square feet in size.

2. Plaintiffs' home was constructed by Bentley Homes.

3. Defendant Fireman's Fund Insurance Co. ("Defendant") issued a homeowner's insurance policy to Plaintiffs, Policy No. NZH 01257615 (the "Policy").

4. The Policy specifically provides that no coverage is provided for water damage resulting from "continuous or repeated seepage or leakage of water or stream from any source over a period of weeks, months, or years. *See* Policy at p. 15 of 21.

5. However, there is an exception to this exclusion, which states there this is coverage where, due to water damage, a loss is sudden and accidental. Sudden

and accidental shall include a physical loss that is hidden or concealed for a period of time. A hidden or concealed loss must be reported no later than thirty (30) days after the date appreciable loss or damage occurs and is detected or should have been detected.

6. The Policy also excludes coverage for "faulty, inadequate or defective... workmanship, repair, construction," or the materials used therein. Policy at 16 of 21.

7. During heavy rain storms, Plaintiffs experienced some minor dripping problems which were limited to isolated areas, usually window sills. However, during dry seasons, there were many consecutive months where Plaintiffs had no water leakage problems.

8. In 2006, Plaintiffs noticed that the paint on many of their windows was peeling, which led them to do further investigation.

9. Plaintiff Adam Spector is a finance executive and Plaintiff Sylvia Spector is a trained graphic designer. Neither possesses any specialized experience or knowledge regarding home construction, moisture intrusion, or the like.

10. Plaintiffs determined that they needed expert advice and retained construction consultant Barry A. Bornstein ("Bornstein") to inspect their home.

11. Plaintiffs hired Bornstein for purposes of evaluating any potential problems with the windows and doors in their home. Plaintiffs believed that Bornstein would be over-zealous in his evaluation, as he was known for preparing reports in anticipation of litigation. Plaintiffs were not considering litigation at the time, but

desired a critical and thorough inspection.

12. Bornstein came out to inspect Plaintiff's home, and interviewed them about the problems they were experiencing.

13. Bornstein performed an inspection and created a report, however, this inspection did not include any invasive testing. Bornstein noted problems with the window and door frames, as well as signs of leakage in the master bedroom on the ceiling. Given that Bornstein's inspection involved a visual inspection of open and accessible areas, he could not provide commentary on any problems which might exist between the external stucco walls and the internal drywall. Therefore, Bornstein recommended that Plaintiffs have the stucco inspected by an expert.

14. Following Bornstein's recommendation, Plaintiffs retained Jerry Yedinak Stucco Inspection and Design to inspect the external stucco of their home.

15. The Yedinak Inspection involved the use of probes to test moisture levels in different areas of Plaintiffs' home. The Yedinak Report indicated that just under ninety-one percent (91%) of the readings from the probes provided acceptable moisture levels, while thirteen (13) of the readings revealed potential problems.

16. However, Yedinak advised Plaintiffs that they could not know the true condition of the substrate through the use of small probes, but rather deconstruction of the walls would be necessary for a thorough assessment.

17. At the time of the Yedinak inspection, Plaintiffs were aware that some of the homes in their neighborhood, all of which are Bentley Homes, were experiencing serious problems due to water damage, while other homes had no such problems.

Plaintiffs found the reports from the two experts that inspected their home to be confusing and conflicting, and to be certain of whether there were in fact any major issues with their home, Plaintiffs hired Campbell Plastering, and consulted with owner Barry Campbell.

18. Upon consultation, Campbell advised Plaintiffs that the only way to discover what problems might exist behind the stucco was to remove the stucco. As a result, Plaintiffs authorized Campbell to remove selected test areas of stucco on the home in order to expose the interior space between the stucco and drywall, and allow the experts access to any problem areas.

19. Prior to removing any areas of stucco for inspection, Campbell advised Plaintiffs that the roof of their home was incorrectly installed. Plaintiffs decided to have the roof of their home redone, along with having their windows replaced.

20. Once the roof was complete and all windows were replaced, Campbell began the rolling removal of the stucco for inspection. At this point, Plaintiffs began to learn of the extent of the water damage to their home. Plaintiffs discovered the full scope of the damage in November 2007, and by the end of November, Plaintiffs were able to make a full assessment of their systemic problems. Plaintiffs then gave notice to Defendant by filing a claim on December 7, 2007.

21. Defendant promptly arranged for a claims adjuster to visit Plaintiffs' home. Claim adjuster Jean Hargrove ("Hargrove") visited Plaintiffs' home in January 2008, and according to Plaintiffs, advised that the insurance claim should be covered by Defendant. Hargrove also advised that Plaintiffs should contact an

attorney, and referred Plaintiffs to Anthony S. Pinnie, whom Plaintiffs later retained for representation in the present action.

22. Upon Hargrove's arrival to Plaintiffs' home, ninety percent (90%) of the work had already been completed. The roof and windows had already been replaced.

23. Hargrove sent a letter to Plaintiffs on December 20, 2007, advising them that while Defendant was investigating their claim, Defendant was reserving all rights under the Policy. Among other Policy provisions cited in the letter, Ms. Hargrove cited to the Policy exclusion for defective construction and the thirty day notice provision for water damage. The letter also notified Plaintiffs that they were obligated to take reasonable steps to prevent further damage to the property.

24. Plaintiffs understood the thirty day notice provision in the Policy to signify that in the instance of hidden damage, each new discovery of damage begins a new thirty day notice cycle.

25. Hargrove met with Plaintiffs on January 11, 2008 to review their claim and potential coverage under the Policy. On January 16, 2008, Hargrove wrote to Plaintiffs to advise them that Defendant was denying their claim, citing the Policy exclusion for defective construction and the thirty day notice provision for water damage as the reasons for denial.

26. Plaintiffs have provided cancelled checks totaling well over $200,000.00, representing the total amount spent to repair their home.

27. Plaintiff Adam Spector is unable to recall with specificity which checks correspond to which portions of the construction work performed, but estimates

that approximately $45,000.00 was spent to replace the ninety-one (91) windows in his home.

28. While Defendant denied coverage of Plaintiffs' insurance claim, Defendant previously paid three other claims on Bentley Homes, under similar circumstances.

29. Approximately one month before Plaintiffs filed their insurance claim, Defendant paid over $120,000.00 in coverage to John and Sarah Schmader based on water damage to their Bentley home.

30. Hargrove was the claims adjuster in the Schmader matter, and she concluded that although the Schmaders admittedly knew about defective windows and water leaks in their home for a couple of years, there was a newly discovered problem with the roof, which resulted in partial coverage.

31. Hargrove acknowledged at trial that a "rolling" thirty day notice period for newly discovered damage was applied in the Schmader matter, and during deposition testimony that it was necessary "to keep an open mind" when new damage is discovered.

32. At trial, Hargrove referenced an inability to assess the damage to Plaintiffs' home because the construction was near completion by the time she visited the home. However, Defendant had access to photographs taken by Campbell which depicted the construction on Plaintiffs' home from start to finish. In addition, after the previously paid claims on Bentley Homes, Defendant was well aware of systemic problems with these homes.

33. Hargrove was centrally involved in the determination that the damage to the Schmader home resulted from problems with water damage to the roof and not some other portion of the structure, despite her lack of expertise or technical background in this area. As a result of her assessment, in collaboration with one of Defendant's experts, a portion of the Schmader claim was paid in the amount of $121,879.36.

34. The same expert called upon by Defendant in the Schmader matter, Mark Massa, was consulted in the Spector matter, and in correspondence, Massa referred to the Spector claim as being "the exact, same claim" as the Schmader claim.

## **CONCLUSIONS OF LAW**

35. To prevail in an action for breach of contract, a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.

36. In the present case, a contract existed between Plaintiffs and Defendant for insurance coverage of the home at 920 Castlehill Lane, Devon, PA. The Policy at issue contains certain provisions regarding the exclusion of coverage. One such provision is the exclusion of coverage for water damage. An exception to this exclusion exists where the loss is sudden and accidental, and this category includes hidden or concealed damage. The exception requires that the insured report the hidden or concealed damage within thirty (30) days of detection or the time that the damage should have been detected.

37. The Court finds that the Policy provides allows an insured party a "rolling" thirty (30) day period, such that a new thirty (30) day period is triggered each time new damage is discovered, or where there is an ongoing discovery of damage.

38. As an exception to a coverage exclusion, a plaintiff has the burden of proving compliance with the thirty (30) day notice requirement. *N. Ins. Co. Of N.Y. v. Aardvark Assocs.*, 942 F.2d 189 (3d Cir. 1991).

39. Campbell Plastering began work at the Spector home in early November, as shown by Plaintiffs' cancelled check to Campbell on November 5, 2007. *See* Pl.'s Ex. 6 at 7. Campbell testified that the stucco was removed, and the extent of the damage determined by the end of November. Dep. of Barry Campbell at 55. As a result, Plaintiffs met their burden to report hidden or concealed water damage when they filed an insurance claim on December 7, 2007, and therefore, performed as mandated by the Policy.

40. Defendant denied Plaintiffs' claim despite Plaintiffs' compliance with the Policy, and therefore, breached the contract with Plaintiffs.

41. Plaintiffs suffered loss when Defendant failed to reimburse them for expenses incurred for repairs to their home due to water damage.

42. Given that Plaintiffs have established the existence of a contract, proper performance, breach of the contract by Defendant, and damages suffered by Plaintiffs, the Court finds in favor of Plaintiffs and against Defendant on Count I - Breach of Contract.

43. The Policy at issue excludes coverage for damage due to defective construction,

workmanship, or materials. Consequently, Defendant had no obligation to reimburse Plaintiffs for amounts spent to repair damages due to any of the above, and amounts incurred by Plaintiff to repair the roof of their home and replace the windows in their home shall not be reimbursed.

44. Therefore, the Court finds that Plaintiffs were suffered loss in the amount of $104,432.50, and Defendant shall reimburse Plaintiff for this amount, as well as reasonable attorney fees and costs.

45. To prove a claim of bad faith, a plaintiff must "demonstrate by clear and convincing evidence '(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis.'" *Brickman Grp, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 930 (Pa. Super. Ct. 2004) (quoting *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa. Super. Ct. 2000)).

46. The Court finds that Plaintiffs failed to establish by clear and convincing evidence both that the insurance lacked a reasonable basis for denying Plaintiffs' claim and that Defendant knew or recklessly disregarded the lack of a reasonable basis. The Court therefore finds in favor of Defendant and against Plaintiffs on Count II - Bad Faith.

47. As such, Defendant has no liability to Plaintiffs for Bad Faith.

48. Additionally, the Court finds that Plaintiffs failed to satisfy their burden of proving that Defendant employed false or deceptive practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law

("UTPCPL").

49. Therefore, the Court finds in favor of Defendant and against Plaintiffs on Count III - Violation of UTPCPL.

50. As such, Defendant has no liability to Plaintiffs under the UTPCPL.

An appropriate Order follows.